Ruth Johnson WILLIAMS and Fred Cook, Jr., Appellants,

v.

UNITED STATES of America, Appellee.

No. 16256.

United States Court of Appeals Ninth Circuit.

Dec. 21, 1959.

Rehearing Denied Feb. 1, 1960.

William H. Neblett, E. W. Miller, Los Angeles, Cal., for appellants.

Laughlin E. Waters, U. S. Atty., Thomas R. Sheridan, Robert John Jensen, Asst. U. S. Attys., Los Angeles, Cal. for appellee.

Before HAMLIN and JERTBERG, Circuit Judges, and LINDBERG, District Judge.

JERTBERG, Circuit Judge.

This is an appeal by Ruth Johnson Williams, hereinafter referred to as Mrs. Williams or appellant, and Fred Cook, Jr., hereinafter referred to as Cook or appellant, from judgments imposing fines and imprisonment upon them following a jury verdict which found them guilty of violating federal narcotics laws, and guilty of conspiracy to violate such laws.[1]

Jurisdiction of the district court was based upon Title 21 U.S.C.A. § 174, Title 18 U.S.C.A. § 371, and Title 18 U.S.C.A. § 3231. This Court has jurisdiction under Title 28 U.S.C.A. §§ 1291 and 1294 (1).

### History of Proceedings

On February 24, 1958, a United States Commissioner issued a search warrant to a narcotics agent authorizing a search of 5417½ South Wilton.

On February 24, 1958, at approximately 3:00 o'clock p. m. the premises located at 5417½ South Wilton, in the City of Los Angeles, State of California, were searched. Certain articles were seized, and the appellants arrested. They were booked at the Los Angeles county jail at about 8:00 o'clock p. m. of that day. Warrants of arrest were issued by the United States Commissioner on February 25, 1958, and appellants were arraigned

---

1. The indictment charges violations of Title 21 U.S.C.A. § 174 and Title 18 U.S.C.A. § 371. The statutes are as follows:
 Title 21 U.S.C.A. § 174:
 "Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or conspires to commit any of such acts in violation of the laws of the United States, shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $20,000. For a second or subsequent offense (as determined under section 7237(c) of the Internal Revenue Code of 1954), the offender shall be imprisoned not less than ten or more than forty years and, in addition, may be fined not more than $20,-000.

 "Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury.
 "For provision relating to sentencing, probation, etc., see section 7237(d) of the Internal Revenue Code of 1954."
 Title 18 U.S.C.A. § 371:
 "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined no more than $10,000 or imprisoned not more than five years, or both.
 "If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor."

on charges of violating the federal narcotics laws.

On March 12, 1958 the federal grand jury in and for the Southern District of California returned an eight-count indictment against appellants, Eddie Jewel Bryant and Juanita Smith, charging in substance as follows:

Count one: On February 14, 1958, Bryant sold 403 grains of heroin to Justin Burley;

Count two: On February 17, 1958, Smith and Bryant sold 303 grains of heroin to Justin Burley;

Count three: On February 17, 1958, Smith received, concealed, and facilitated the transportation of 303 grains of heroin;

Count four: On February 21, 1958, Bryant received, concealed, and facilitated the transportation of 390 grains of heroin;

Count five: On February 24, 1958, appellants and Bryant sold 2 ounces, 339 grains of heroin to Justin Burley;

Count six: On February 24, 1958, appellants and Bryant received, concealed, and facilitated the transportation of 2 ounces, 339 grains of heroin;

Count seven: On February 24, 1958, Mrs. Williams received, concealed, and facilitated the concealment of 3 ounces, 404 grains of heroin;

Count eight: Beginning on February 14, 1958, and continuing to date of the indictment, appellants, Smith and Bryant conspired to sell, receive, conceal, and facilitate the transportation and concealment of heroin; overt acts duplicating Counts One, Three, Six, and Seven were set forth in the indictment.

On April 21, 1958, the four persons indicted pleaded not guilty to each and every count of the indictment. Prior to such time Mrs. Williams filed a motion to suppress the property seized on February 24, 1958, on the grounds that the search warrant was unlawful and in violation of Rule 41 of the Federal Rules of Criminal Procedure, 18 U.S.C.A. Following the taking of testimony, the district court held that the search warrant was void on its face. He further held that the arrest of Mrs. Williams was valid as having been made on probable cause and, therefore, that the property seized was in the lawful possession of the appellee because it was obtained by lawful search and seizure incident to a valid arrest.

On May 28, 1958, the jury returned verdicts which found:

1. Mrs. Williams guilty on all counts charged: Five, Six, Seven and Eight.

2. Cook guilty on all counts charged: Five, Six, and Eight.

3. Defendant Bryant guilty on all counts charged: One, Two, Four, Five, Six and Eight.

4. Defendant Smith not guilty on any count charged: Two, Three and Eight.

Motions of appellants for judgments of acquittal, or in the alternative for a new trial, were denied. Prior to sentencing the government filed an information alleging that Mrs. Williams had suffered a prior federal narcotics conviction, the truth of which was admitted by Mrs. Williams on arraignment.

The trial judge committed Mrs. Williams to custody for imprisonment for a period of ten years and to pay a fine in the sum of $5,000 on each of the counts five, six and seven, and to imprisonment for a period of five years on count eight. All sentences were to begin and run concurrently, and the payment of the sum of $5,000 would satisfy and discharge the fines on all counts. The trial judge committed Fred Cook, Jr. to custody for imprisonment for a period of five years on each of counts five, six and eight, sentences to begin and run concurrently with each other.

Appeals from said judgments to this Court were timely filed.

### Statement of the Case

On February 24, 1958, at approximately 3:00 o'clock in the afternoon, a group of five law enforcement officers, two of

them federal[2] and three of them state,[3] arrived at the home of Mrs. Williams in Los Angeles. They were armed with the search warrant which had been obtained on the morning of the same day. They were without a warrant for her arrest.

One of the officers knocked at the door of Mrs. Williams' home, and hearing no response from within, entered the house through the shut but unlocked door. The officers met Mrs. Williams in the house. She had apparently just arisen from a nap. At this point one of the state officers placed Mrs. Williams under arrest for violation of the federal narcotics laws. The search warrant was then exhibited to her, and a thorough search of the premises was made. Outside of the home, in the trash and garbage area, 3 ounces, 404 grains of heroin were discovered, in four small brown envelopes, which were taken from a trash can. Possession of this heroin constituted the crime charged in count seven. Meanwhile on the ground floor of Mrs. Williams' home, Cook [a nephew of Mrs. Williams] was found. He was also placed under arrest for violation of the federal narcotics laws. In addition to the heroin, the officers took $15.00 in marked money from Mrs. Williams' purse, which money allegedly was received from the sale of heroin on the morning of the arrest, which sale allegedly took place between Deputy Burley and the defendant Bryant. This sale constituted the crimes charged in counts five and six. This money had been dusted with a fluorescent powder prior to the alleged sale. Under an ultraviolet light used by the officers in the search, the following items fluoresced: the coffee table, the telephone, the clasp of Mrs. Williams' purse, Mrs. Williams' fingertips, Cook's fingertips, and the inside of a coat pocket. In addition to the marked currency and the heroin, other items of property were taken on the search.[4]

Following the search, appellants were taken from the home of Mrs. Williams to the Federal Narcotics office located in the Federal Building in downtown Los Angeles, where they arrived about 6:00 p. m. They were not taken before the United States Commissioner until the next morning. Appellants were kept in the Federal Narcotics office for two or three hours and both were questioned separately by the officers. Mrs. Williams maintained her innocence of the charges, but Cook after questioning signed a statement, which was typed by one of the officers, which was in question and answer form, in which he confessed to his complicity in the trafficking in narcotics. After the questioning of appellants they were booked at the Los Angeles County jail. There was no further contact between the officers and the appellants until their arraignment before the United States Commissioner on the following morning.

The following statement of events and their sequence leading up to the arrest of the appellants has been taken largely from the appellee's brief, and is not controverted in the reply brief of appellants, and is supported by the record.

2. The federal officers were Federal Narcotics Officers Richards and Gilkey, operating out of Los Angeles, California.

3. The state officers were Los Angeles County Deputy Sheriffs Gillette, Landry and Farrington.

4. "The following is an inventory of property taken pursuant to the warrant:
 1 small bottle of milk sugar (full)
 1 " ' " " corn starch (½ full)
 1 box .32 automatic bullets
 1 " .30–.30 shells (½ full)
 $15.00 marked Official Advance Fund;
 (1 $10.00 & 1–$5.00)
 4 rolls Scotch Tape
 (2 Empty Milk sugar cans
 (1 Milk sugar can containing plastic bag w/
 In Yard ( small brn envelope w/ alleged narcotics—
 ( heroin.
 (1 can containing 4 small brn envelopes
 ( w/ envelopes w/ alleged narcotics—heroin
 (
 1 stapling machine w/ staples
 1 'Sheik' box w/ wrappings of 6 contraceptives
 1 paper tablet w/ markings."

In the latter part of January, 1958, or the early part of February, 1958, a confidential informant, Jesse Thomas, advised the narcotics officers that Ruth Williams was selling narcotics out of 5417½ South Wilton Place, Los Angeles, and was a source of heroin for Eddie Jewel Bryant.

On February 10, 1958, Justin B. Burley, a Deputy Sheriff of the Los Angeles County Sheriff's Office assigned to the narcotics detail, met Jesse Thomas, an informant or "special employee" and made arrangements to meet defendant Eddie Jewel Bryant. After Jesse Thomas had apparently purchased $50 worth of heroin from Bryant with Official Advance Funds of the Federal Government, Justin Burley was introduced to Bryant as a brother of Jesse Thomas. The Deputy Sheriff was not present when the informer received the "stuff", but the informer passed the "stuff" over to the Deputy in the presence of defendant Bryant. There is no substantive count in the indictment relating to this transfer.

On February 13, 1958, Deputy Sheriff Burley picked up the informant, Jesse Thomas, and met other deputies and federal agents at a drive-in. At approximately 11:00 that morning Jesse Thomas and Deputy Burley made a telephone call to defendant Bryant, and immediately thereafter met defendant Bryant at a street corner. The deputy and the informer entered Bryant's vehicle; wherein, the deputy negotiated with Bryant for the purchase of one-half ounce of heroin for $250 which was paid to her then and there but the delivery of heroin was to be arranged by subsequent telephone call. Deputy Burley received constant coverage from his fellow officers from the time he met defendant Bryant until he rejoined his covering officers. At about 12:50 p. m. the same day, Deputy Burley and Jesse Thomas telephoned Bryant and, upon hanging up, immediately proceeded to 4015 Kansas Avenue, Los Angeles, the home of defendant Bryant. The undercover deputy sheriff and the informer entered Bryant's home and were told by Bryant that she had not

been able to contact her connection. After waiting in Bryant's home for about three hours without being able to "score", the deputy left the residence, conferred with his fellow agents, returned to the residence, got his $250 back from Bryant, and again met with the other agents. Deputy Burley was covered by his fellow agents during this entire period. The events that occurred on the 13th of February, 1958, were not the basis of a substantive count in the indictment. The informant, Jesse Thomas, had no further connection with the sequence of events leading up to the arrests and convictions of appellants.

On February 14, 1958, Deputy Burley telephoned defendant Bryant and she told him she was "ready to do business." The deputy proceeded to Bryant's residence, entered, and conferred with Bryant regarding the purchase of heroin. The deputy gave Bryant $250 of Official Advance Funds, at which time Bryant telephoned "Nita," and said, "I have the money and I will be right over." Bryant then left 4015 Kansas Avenue, Los Angeles, California, but returned in five minutes and advised the deputy that the deal was working. Defendant Juanita Smith resided at 4011 Kansas Avenue the next door neighbor of defendant Bryant.

A short time later, while Bryant and the deputy were waiting in Bryant's home, the expected telephone call came, and Bryant made arrangements to meet some one near 54th Street and Wilton in Los Angeles, California. The deputy and Bryant left Bryant's home, entered Bryant's vehicle, and proceeded to the corner of 54th and Van Ness in Los Angeles, where Bryant told the deputy to wait on the corner. Deputy Burley observed Bryant's car travel the few blocks to 54th and Wilton and there disappear from his view.

Covering deputies and agents observed the above detailed sequence of events, including: the deputy telephoning, the deputy entering Bryant's home, Bryant leaving her home and entering 4011 Kansas Avenue—the house next door to

Bryant's and the deputy and Bryant leaving Bryant's home and entering her automobile. These same covering agents attempted to pursue Bryant's vehicle without being detected, but lost her in traffic around 48th Street; however, they again observed the vehicle about 25 minutes later with Bryant and Deputy Burley in it when it arrived back at Bryant's home, at which time Burley left Bryant and subsequently met with these covering agents.

Deputy Burley waited on the street corner for about 10 or 15 minutes; then Bryant reappeared in her vehicle, picked up Burley, and handed Burley a contraceptive containing approximately one ounce of heroin.

The above-related circumstances happened on February 14, 1958, and relate to counts one and eight of the indictment.

On February 17, 1958, Deputy Burley telephoned Bryant and arranged to purchase an ounce of heroin. The deputy then drove to Bryant's home, parked his car, and was admitted by Bryant into her home. There was another person in the home at this time named Jimmy, but he was not a witness at the trial. The deputy discussed the possibility of bigger buys of narcotics with Bryant who advised the deputy it could be arranged. The deputy then handed Bryant $250 of Official Advance Funds, joined "Jimmy" in the other room, and overheard Bryant talk on the telephone and ask for "Juanita". A little later, Deputy Burley overheard Bryant telephone again and ask for Juanita. Ten or fifteen minutes later Deputy Burley saw Bryant answer the front door and talk to what sounded like a woman whom Bryant subsequently identified as being "Juanita". Although Deputy Burley could not and did not see the caller, the covering agents outside the house saw this caller and identified her as Juanita Smith. Forty-five minutes after Juanita left and Bryant told Deputy Burley that the deal was working, a little girl rang the doorbell but Bryant would not open the door. Then, eight minutes later Juanita Smith rang the doorbell, Bryant met her at the door, and Juanita left. Bryant immediately returned to the deputy and handed him a contraceptive which contained 303 grains of heroin.

Deputy Sheriff Farrington, on this same date, was one of the covering officers. He observed Deputy Burley make a telephone call, and shortly thereafter enter Bryant's residence at 4015 Kansas Avenue, Los Angeles, California. He then "staked out" in such a position that he was able to see the entire front of Bryant's house and part of one side. After some wait, he observed Juanita Smith and appellant Ruth Williams drive up in a 1957 green Chevrolet belonging to Fred Cook, and park between 4011 and 4009 Kansas Avenue. Williams entered 4011 Kansas Avenue, Smith went to the door of 4015 Kansas Avenue; and then both Williams and Smith returned to the vehicle and drove off. Deputy Sheriff Landry and Federal Agent Richards followed Smith and Williams to 5417½ South Wilton Place, Los Angeles, California, waited a short time and then returned to 4015 Kansas Avenue. About 35 minutes later, Farrington saw Juanita Smith drive up to 4015 Kansas Avenue, Los Angeles, California, in a 1957 Ford which belonged to appellant Ruth Williams alias Johnson. Smith went into Bryant's home for a few minutes, came out, and drove away in Cook's car. Deputy Sheriff Gillette was with Deputy Farrington and testified to the same events. Deputy Sheriff Landry was also "staked out" but in a different location; he testified to the same events.

As soon as Bryant handed Deputy Burley the contraceptive containing heroin, Burley left Bryant's home, met with his covering officers, and all present initialed the contraceptive.

The above-related circumstances happened on February 17, 1958, and pertain to counts two, three and eight of the indictment.

On February 20, 1958, Deputy Burley met defendant Bryant "by accident," that is, without any prearrangement, in the Los Angeles Municipal Court. At that time, Bryant—referring back to their

conversation on February 17, 1958—informed Burley that her (Bryant's) connection agreed to sell three ounces of heroin for $700 or four ounces for $750, and Burley said he would see her soon.

On February 21, 1958, there was a repeat performance of the transaction of February 14, 1958. On February 21, 1958, Burley telephoned Bryant; Burley went to Bryant's home at 4015 Kansas Avenue, Los Angeles, California, entered this residence and talked to Bryant; Burley and Bryant left Bryant's home, entered Bryant's vehicle, and drove to 54th and Van Ness in Los Angeles, California, where Burley left the vehicle and waited on that corner. About 15 minutes later, Bryant returned to the corner, picked up Burley, and handed him a contraceptive containing 390 grains of heroin.

On this date Deputy Sheriff Farrington was one of the covering officers. He observed: Burley make a telephone call, Burley enter Bryant's home, Burley and Bryant leave Bryant's home and drive off in Bryant's vehicle. He further observed: Burley get out of Bryant's car on the corner of 54th and Van Ness, Bryant drive to 5417½ South Wilton Place, Los Angeles, California the home of appellant Ruth Williams. Deputy Farrington then saw Bryant enter 5417½ South Wilton Place, Los Angeles, California. Shortly thereafter Deputy Farrington saw Bryant leave the alley alongside 5417½ South Wilton Place, drive away in her vehicle, pick up Burley on the street corner, and return to her home. Farrington then met with Burley and the other officers and initialed the evidence.

Deputy Sheriff Gillette was with Deputy Farrington on February 21, 1958, and he observed the same events.

The above related circumstances pertain to counts four and eight of the indictment.

On February 24, 1958, the sequence of events is as follows: In the morning of February 24, 1958, the agents prepared $750 of Official Advance Funds by recording the serial number of each bill and by dusting each bill with a fluorescent powder which is invisible to the naked eye but fluoresces in color under an ultraviolet or "black" light. Federal Narcotics Agent Malcolm Richards appeared before United States Commissioner Theodore Hocke and obtained a search warrant for 5417½ South Wilton Place.

At about noon on February 24, 1958, Deputy Burley telephoned Bryant and advised her he was ready "to do the big thing." Burley drove to Bryant's home, entered therein at about 1:00 o'clock and agreed to purchase 3 ounces of heroin from Bryant for $750 which he gave her. A short time later Bryant answered the doorbell, spoke briefly to a man Burley could not see from where he was, returned to Burley in the bedroom and advised him that there was a slip-up in that her connection misunderstood the order and sent over 3 half pieces, (half ounces) rather than 3 whole pieces (ounces), but he would be back shortly with the other 3 halves. About 20 minutes later Bryant again answered the front door, talked briefly to a man, returned to Burley in the bedroom and handed him 3 more contraceptives containing heroin. After Burley had received 6 contraceptives containing heroin from Bryant he left Bryant's home and conferred with Agents Richards and Gilkey. Burley then met Sheriff's Deputies Farrington and Smith (a female deputy) and Federal Narcotics Agents Abe and Ruomo and returned to Bryant's home. Bryant was arrested in her home by these officers and $150 (one fifty and ten ten dollar bills) of the original $750 given to Bryant by Burley was recovered from Bryant's purse. This ended the roles of Bryant and Burley.

Four of these covering officers: Farrington, Smith, Abe, and Ruomo took up positions at Bryant's home at 4015 Kansas Avenue, Los Angeles, California. The other four officers proceeded to positions at the home of appellant Williams, 5417½ South Wilton Place, Los Angeles, California.

At about 12:40 p. m. Deputies Gillette and Landry "staked out" in a yard across the alley from the home of appellant Williams.

Around 1:00 p. m. these two officers saw appellant Williams come out of her home on the second floor, walk down the stairway, disappear from their vision around the corner of her yard (towards where the trash cans are kept, in which some 4 ounces of heroin were subsequently found), reappear some few minutes later, walk up the stairs, and apparently re-enter her home. A few minutes later, around 1:10 p. m., appellant Fred Cook, Jr., walked down the same stairs carrying some clothing.

Deputy Farrrington observed that about 1:20 p. m. appellant Cook drove up in his car, parked, walked to and entered Bryant's home carrying some clothing, remained inside for several minutes, left Bryant's home carrying the same clothing, entered his car and drove off.

Deputies Gillette and Landry, back at appellant Williams' home, at about 1:40 p. m., saw appellant Cook walk up the stairs to appellant Williams' home carrying the same clothing he had left with. Some five or ten minutes later appellant Cook was again observed walking down the same stairway carrying the same clothing.

At 1:50 p. m. Deputy Farrington observed appellant Cook drive up to Bryant's home, park, enter Bryant's home carrying the same clothing, come out of Bryant's home a few minutes later carrying the same clothing, enter his car and drive off.

At about 2:00 p. m. the officers around appellant Williams' house observed appellant Cook walk up the stairs carrying the same clothing he had left with on both occasions.

At about this time, 2:00 p. m., Deputy Burley left Bryant's home and conferred with the officers who had been covering Bryant's home as well as two agents who had been at appellant Williams' home for part of the time, and showed them the evidence as he advised them of the events as he saw them from inside the house. Deputy Burley, accompanied by Deputies Farrington and Smith, and Federal Agents Abe and Ruomo, then returned to Bryant's home and arrested her. After Deputy Farrington assisted in the search of Bryant's home and the recovery of some of the marked money, he joined the other agents and deputies in the area of appellant Williams' home. The arrests of the appellants and the search then took place.

Shortly after Cook's arrest he was asked if he knew where any narcotics were, and he stated he believed there were narcotics out by the trash can.

In the course of the trial the trial court, over the objections of appellants, received in evidence the articles seized at the time of the search, and the signed confession of Cook.

The errors assigned by the appellants on this appeal may be grouped under the following headings:

1. That the search and seizure at 5417½ South Wilton Place, Los Angeles, California, was illegal, and the trial court erred in denying appellants' motions to suppress such evidence;

2. That the testimony of the officers relating to their entry into the home of Mrs. Williams and the articles seized were inadmissible in evidence, and the trial court erred in receiving testimony and such articles into evidence;

3. That the identity of the informer should have been divulged, and the trial court erred in denying appellant's motions to acquit;

4. That the signed confession of Cook was inadmissible, and the trial court erred in receiving such confession into evidence;

5. That the evidence was insufficient to sustain the convictions of appellants, and the trial court erred in denying appellants' motions for acquittal, or in the alternative for a new trial.

We will first consider appellants' contention that the search and seizure was illegal, and that the trial court erred in admitting into evidence the testimony of the officers and the articles seized. The trial court held that the search warrant was void on its face. In considering this point, we will proceed on the premise that the narcotics officers, when they en-

tered Mrs. Williams' home, were without either a search warrant or a warrant of arrest. It is basic that the arrest cannot be justified by the results of the search, however incriminating they may be, if the search is unlawful at the start. United States v. DiRe, 1947, 332 U.S. 581, 595, 68 S.Ct. 222, 229, 92 L.Ed. 210, where the Court said: "We have had frequent occasion to point out that a search is not to be made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success."

The contention of appellants presents three questions: First, at the time of the arrests did the arresting officers have "probable cause" within the meaning of the Fourth Amendment to believe Mrs. Williams and Cook had committed or were committing violations of the narcotics laws? Second, if "probable cause" existed, were the arrests validly executed? And, third, if "probable cause" existed and the arrests were validly executed, was the ensuing search of Mrs. Williams' premises reasonable and incident to her lawful arrest?

Since the activity of the officers which culminated in the return of the indictment was a joint federal-state enterprise, it is clear that the participation of federal officers makes the enterprise a federal one for purposes of prosecution for violations of federal law. Lustig v. United States, 1949, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819. The existence of "probable cause" must be determined by federal law. The Supreme Court of the United States has considered the subject of "probable cause" in many decisions. In Brinegar v. United States, 1949, 338 U.S. 160, the Court stated at page 175, 69 S.Ct. 1302, at page 1310, 93 L.Ed. 1879:

"In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.

" 'The substance of all the definitions' of probable cause 'is a reasonable ground for belief of guilt.' McCarthy v. De Armit, 99 Pa. 63, 69, quoted with approval in the Carroll opinion. [Carroll v. United States] 267 U.S. [132] at page 161, 45 S.Ct. [280] at page 288, 69 L.Ed. 543. And this 'means less than evidence which would justify condemnation' or conviction, as Marshall, C. J., said for the Court more than a century ago in Locke v. United States, 7 Cranch 339, 348, 3 L.Ed. 364. Since Marshall's time, at any rate,[14] it has come to mean more than bare suspicion: Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543.[15]"

In the instant case, the arresting officers at the time of the arrests had

"14. Marshall's full statement in Locke v. United States was: 'It may be added, that the term "probable cause," according to its usual acceptation, means less than evidence which would justify condemnation; and, in all cases of seizure, has a fixed, and well known meaning. It imports a seizure made under circumstances which warrant suspicion.' 7 Cranch 339, 348, 3 L.Ed. 364.

"15. To the same effect are: Husty v. United States, 282 U.S. 694, 700–701, 51 S.Ct. 240, 241, 75 L.Ed. 629; Dumbra v. United States, 268 U.S. 435, 441, 45 S.Ct. 546, 548, 69 L.Ed. 1032; Steele v. United States, No. 1, 267 U.S. 498, 504–505, 45 S.Ct. 414, 416–417, 69 L.Ed. 757; Stacey v. Emery, 97 U.S. 642, 645, 24 L.Ed. 1035.

"The Carroll opinion also quotes with approval the following statement: 'If the facts and circumstances before the officer are such as to warrant a man of prudence and caution in believing that the offense has been committed, it is sufficient.' "

information from the confidential informant Jesse Thomas that Mrs. Williams was selling narcotics from 5417½ South Wilton Place, Los Angeles, and was a wholesale source of heroin for retail sales being made by the defendant Eddie Jewel Bryant. Thomas had been a special paid employee of the Los Angeles Police Department on and off for several years, and had a record of reliable service as such special employee. It further appears all of the officers identified Thomas as the source of information, and one officer testified to a passing acquaintance with Thomas since early school days. On prior occasions the information supplied to narcotics officers by Thomas concerning violations of the narcotics laws had been found by the officers to be reliable. Prior to the arrests the officers verified some of the information furnished by Thomas, by ascertaining her existence, and that she lived at 5417½ South Wilton Place, Los Angeles, and that accounts for utilities supplied to such residence were in the name of Mrs. Williams. In addition, at the time of the arrests the officers were aware of the observations made by them of the activities of Mrs. Williams and Cook as narrated supra under "Statement of the Case". Were the facts and circumstances within the knowledge of the officers and of which they had reasonably trustworthy information sufficient to warrant men of reasonable caution in believing that Mrs. Williams and Cook had been or were violating the federal narcotics laws?

Before reaching a conclusion as to appellants' contention, we will consider Draper v. United States, 1959, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327; Rodgers v. United States, 9 Cir., 1959, 267 F.2d 79; and Butler and Cahee v. United States, 9 Cir., 1959, 273 F.2d 436. In the Draper case, federal officers arrested Draper for the same substantive offense as is charged in the indictment in this case. The information received by the officers in Draper was that Draper would be arriving from Chicago in Denver at a certain time by a certain train with narcotics in his possession. The officers

were also informed as to details of Draper's appearance, dress, manner of walking, etc. The observations made by the officers prior to the arrest of Draper coincided with the information supplied by the informer. Information supplied by the informer to the officers on prior occasions had been found to be reliable. The Supreme Court sustained the arrest of Draper without a warrant as having been made on probable cause. In Rodgers, the informant was unknown to the customs officers prior to his furnishing information concerning the unlawful trafficking in narcotics by the defendants in that case. The officers, however, were able to verify much of the information furnished by the informant prior to the arrest of the defendants which had by the time the arrests were made proved to be reasonably reliable. In the light of the facts and circumstances of this case this Court sustained the arrest of Rodgers without a warrant as having been based on probable cause. In the Butler and Cahee case, arrests were made without warrants on information furnished by an informant to an experienced narcotics officer. The informant in two months service as a paid informer had furnished accurate information on narcotics violations on four prior occasions. In that case this Court sustained the arrest of Butler without a warrant as having been made upon probable cause.

In the instant case, we have information of the unlawful activities of Mrs. Williams furnished by a reliable informer, verification by the officers of some of that information, plus the knowledge gained and the observations made by the officers of the activities of the appellants. We are unable to say as a matter of law that at the time the arrests were made the officers did not have probable cause to warrant a man of reasonable caution in the belief that an offense had been or was being committed by the appellants. It is to be remembered that the matter of "probable cause" was before the trial court on two occasions: first, on the motion to suppress made prior to the trial, and the renewal

of the motion during the course of the trial. On the hearing of the motion witnesses testified before the trial court. Thus the trial court had the opportunity to judge the credibility of the witnesses and give consideration to the same in resolving the issue of "probable cause". We cannot say that the trial court's rulings were error.

 Having held that "probable cause" existed for the making of the arrests, the question arises as to whether the arrests were lawfully executed. The officers entered the home of Mrs. Williams through the shut but unlocked door after knocking and receiving no response. When Mrs. Williams appeared she was placed under arrest by a state officer for violating the federal narcotics laws. The lawfulness of the arrests of appellants depends upon the power of the arresting officer to enter the home of Mrs. Williams through an unlocked door after knocking several times and receiving no response, in order to arrest without warrants persons whom the arresting officer had probable cause to believe were violating the federal narcotics laws. The federal narcotics officers participating in the enterprise had such authority under Title 26 U.S.C.A. § 7607.[5] "The terms 'probable cause' as used in the Fourth Amendment and 'reasonable grounds' as used in § 104(a) of the Narcotics Control Act, 70 Stat. 570, are substantial equivalents of the same meaning. United States v. Walker, 7 Cir., 246 F.2d 519, 526; cf. United States v. Bian-

co, 3 Cir., 189 F.2d 716, 720." Draper v. United States, 1959, 358 U.S. 307, 310, 79 S.Ct. 329, 331, 3 L.Ed.2d 327. In the instant case, the federal narcotics agents participating in the enterprise did not exercise such authority, but the arrest of Mrs. Williams was made by a state officer who was authorized to make such arrest by Section 844 of the Penal Code of the State of California.[6] Since the enterprise was a federal one, the validity of the arrest must be measured by federal law if there is an applicable federal statute. If not, the validity of the arrest must be judged by state law. In United States v. DiRe, supra, 332 U.S. at page 589, 68 S.Ct. at page 226, the Supreme Court said, "We believe, however, that in absence of an applicable federal statute the law of the state where an arrest without warrant takes place determines its validity." See also Miller v. United States, 1958, 357 U.S. 301, 305, 78 S.Ct. 1190, 1193, 2 L.Ed.2d 1332, where the Supreme Court reiterated this rule: "This Court has said, in the similar circumstance of an arrest for violation of federal law by state peace officers, that the lawfulness of the arrest without warrant is to be determined by reference to state law." Our attention has been called to no applicable federal statute, although the government mildly suggests Title 26 § 7607. Clearly such statute gives authority to a federal narcotics agent to make an arrest without a warrant if he has reasonable grounds to believe that the person to be arrested has committed

5. "§ 7607. The Commissioner, Deputy Commissioner, Assistant to the Commissioner, and agents, of the Bureau of Narcotics of the Department of the Treasury, and officers of the customs (as defined in section 401(1) of the Tariff Act of 1930, as amended; 19 U.S.C., sec. 1401 (1)), may—
 "(1) carry firearms, execute and serve search warrants and arrest warrants, and serve subpenas and summonses issued under the authority of the United States, and
 "(2) make arrests without warrant for violations of any law of the United States relating to narcotic drugs (as defined in section 4731) or marihuana (as defined in section 4761) where the violation is com-

mitted in the presence of the person making the arrest or where such person has reasonable grounds to believe that the person to be arrested has committed or is committing such violation."

6. California Penal Code, Section 844, provides:
 "To make an arrest, a private person, if the offense be a felony, and in all cases a peace officer, may break open the door or window of the house in which the person to be arrested is, or in which they have reasonable grounds for believing him to be, after having demanded admittance and explained the purpose for which admittance is desired."

or is committing violations of the federal narcotics laws. The statute is silent as to the means or methods of making such arrests. More important, however, is the fact that Mrs. Williams was arrested not by a federal narcotics agent acting pursuant to such statute but by a state officer. If the arrest of Mrs. Williams had been made by a federal narcotics agent, the statute might be considered the applicable federal statute. This is a question, however, which we need not decide because the arrest of Mrs. Williams was made by a state officer. We must, therefore, look to the law of the State of California to determine whether her arrest was validly executed.

The law of the State of California relating to the right of a peace officer to enter a private dwelling to effect a lawful arrest is contained in Section 844 of the Penal Code of the State of California, supra. This Penal Code section was construed by the Supreme Court of the State of California in People v. Maddox, 1956, 46 Cal.2d 301, 294 P.2d 6, certiorari denied, 1956, 352 U.S. 858, 77 S.Ct. 81, 1 L.Ed.2d 65. In that case the defendant was convicted for selling heroin. The arrest was made in a private dwelling without a warrant by a state officer who had reasonable grounds for believing that the state narcotics laws were being violated. The officer sought entrance to the home by knocking. He then kicked open the door and arrested the defendant. The Court stated at page 306 of 46 Cal. 2d, at page 9 of 294 P.2d:

> "It must be borne in mind that the primary purpose of the constitutional guarantees is to prevent unreasonable invasions of the security of the people in their persons, houses, papers, and effects, and when an officer has reasonable cause to enter a dwelling to make an arrest and as an incident to that arrest is authorized to make a reasonable search, his entry and his search are not unreasonable. Suspects have no constitutional right to destroy or dispose of evidence, and no basic constitutional guarantees are violated because an

officer succeeds in getting to a place where he is entitled to be more quickly than he would, had he complied with section 844. Moreover, since the demand and explanation requirements of section 844 are a codification of the common law, they may reasonably be interpreted as limited by the common law rules that compliance is not required if the officer's peril would have been increased or the arrest frustrated had he demanded entrance and stated his purpose. Read v. Case, 4 Conn. 166, 170 [10 Am.Dec. 110]; see Rest., Torts, § 206, comment d. Without the benefit of hindsight and ordinarily on the spur of the moment, the officer must decide these questions in the first instance. \* \* Moreover, since the officer's right to invade defendant's privacy clearly appears, there is no compelling need for strict compliance with the requirements of section 844 to protect basic constitutional guarantees. Cf. People v. Boyles, supra, 45 Cal.2d 652, [656] 290 P.2d 535; People v. Cahan, supra, 44 Cal.2d 434, 442, footnote, 282 P.2d 905 [50 A.L.R.2d 513.]

> "We conclude therefore that when there is reasonable cause to make an arrest and search and the facts known to him before his entry are not inconsistent with a good faith belief on the part of the officer that compliance with section 844 is excused, his failure to comply with the formal requirements of that section does not justify the exclusion of the evidence he obtains."

See also People v. Cahill, 1958, 163 Cal. App.2d 15, 328 P.2d 995; People v. Morris, 157 Cal.App.2d 81, 320 P.2d 67.

In the instant case the officers did not break any doors or in any other manner perpetrate a forceful entry. After receiving no response to their knocking, the officers simply opened an unlocked door and entered without objection. The state officer then placed Mrs. Williams under arrest for violation of the federal

narcotics laws. In our view, under California law the arrest of Mrs. Williams was validly executed.

Cook was arrested in the home of Mrs. Williams. It follows from what has been said that his arrest was also lawful.

We have reviewed the authorities cited and relied upon by the appellants, but find none of them is in point, and each is distinguishable on its facts from the instant case. As an instance is Miller v. United States, supra. In that case the Supreme Court held that forcible entry and arrest by local District of Columbia peace officer, acting in concert with federal officers, was unlawful under laws of the District of Columbia. In the instant case there was no forceful entry as there was in Miller. But more important is the fact that the arrests in the instant case were lawfully executed under the law of the State of California.

Since "probable cause" existed for the arrests of the appellants, and since the arrests were lawfully executed under the laws of the State of California, the question remains as to the validity of the search and seizure. The record is clear that Mrs. Williams was placed under arrest by the state officer immediately after his entry into her home and prior to the search. The above statement finds corroboration in the testimony of Mrs. Williams. Appellant's argument that the existence of the search warrant and the lack of a warrant of arrest conclusively demonstrated that the major purpose of the entry into Mrs. Williams' home was to search the premises and not to arrest her was put to rest in the somewhat similar case of Donahue v. United States, 9 Cir., 1932, 56 F.2d 94. In that case the Court was faced with the testimony of the officers that the purpose of the entry was to search and not to arrest, but nevertheless the Court stated, at page 97:

"The fact that the officers intended when they entered the premises to make a search of the premises for a still would not make the arrest illegal, if when they entered they were justified in so doing for the purpose of making the arrest which they did

in fact make. Nor do we think that the failure of the officers, in their testimony, to assign as the purpose of their entry the making of the arrest, makes the arrest illegal. Nor does their statement that they intended to search for a still, if the fact justified it, necessarily eliminate the conclusion that they also intended to make the arrest when they entered the premises. It is familiar law that it is presumed that one intends to do that which he in fact does do."

■ The right to search the person of one placed under arrest and to search the vicinity of the arrest has found frequent judicial approval. In Draper v. United States, supra, 358 U.S. at page 314, 79 S.Ct. at page 333 the Supreme Court stated:

"The arrest was therefore lawful, and the subsequent search and seizure, having been made incident to that lawful arrest, were likewise valid."

Appellants rely, among other cases, on Work v. United States, 1948, 100 U.S. App.D.C. 237, 243 F.2d 660; Johnson v. United States, 1948, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436; Trupiano v. United States, 1948, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663; McDonald v. United States, 1948, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153; and Jones v. United States, 1958, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514. In Work v. United States, there was no arrest prior to the search. In Johnson v. United States the search was not incident to a lawful arrest because made without a warrant and without "probable cause". McDonald v. United States and Jones v. United States both deal with the problem of entry into homes for the purpose of search and seizure and not such entry for purposes of arrest. Reliance on Trupiano v. United States is misplaced, for the holding in that case that a valid arrest does not necessarily make a search incident to that arrest without a search warrant valid was expressly overruled in United States v. Rabinowitz, 1950, 339 U.S. 56, 70 S.Ct. 430, 435, 94 L.Ed. 653, the Su-

preme Court holding: "To the extent that Trupiano v. United States, 334 U.S. 699 [68 S.Ct. 1229, 92 L.Ed. 1663] requires a search warrant solely upon the basis of the practicability of procuring it rather than upon the reasonableness of the search after a lawful arrest, that case is overruled."

▉▉▉▉▉ The instant case is not solely a search and seizure case. It is a case of search and seizure incident to a lawful arrest. The only problem, therefore, is whether, within the dictates of the Fourth Amendment, the search and seizure was lawful as incident to a valid arrest. (See footnote 4 for list of property seized.)

The search was conducted only in Mrs. Williams' home, yard, and the trash area used in connection therewith, and did not extend beyond the limits of her property. We believe that the search was clearly reasonable in extent. United States v. Rabinowitz, supra; Harris v. United States, 1947, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399. The argument that the search which located the property seized was an unreasonable search must be rejected because each item seized which was received in evidence was reasonably related to the purpose for which the arrest was made, namely, illegal trafficking in narcotics. See Leahy v. United States, 9 Cir., 1959, 272 F.2d 487. The instant case is readily distinguishable from Kremen v. United States, 1954, 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876, wherein the Supreme Court condemned a search in the course of which the entire contents of a house were seized and removed 200 miles away, to the offices of the Federal Bureau of Investigation for the purpose of examination. The Supreme Court stated at page 347 of 353 U.S., at page 829 of 77 S.Ct. that such action was "beyond the sanction of any of our cases". The search in the instant case was not that type of exploratory search conducted merely for evidence of crime which was condemned in United States v. Lefkowitz, 1932, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877. It was a search designed to produce evidence of illegal narcotics activities, the offenses for which Mrs. Williams had been arrested. The search was successful.

We hold that since the search was incident to a lawful arrest the search was valid and reasonable, and further that the search was reasonable in extent. There was no violation of the constitutional rights of the appellants, and the trial court's refusal to suppress the evidence was not error.

In respect to appellants' second contention that the court erred in receiving into evidence such of the items of property seized which were offered and received in evidence and the testimony of the officers relating to their entry into the home of Mrs. Williams, we hold that the testimony and exhibits received in evidence were relevant and legally obtained as the result of a legal search and seizure. Such evidence may be lawfully used in a federal prosecution. We realize that under the holding of Weeks v. United States, 1914, 232 U.S. 383, 34 S. Ct. 341, 58 L.Ed. 652, and other cases, that if the evidence received had been obtained in an illegal search and seizure such evidence could not be used in a federal prosecution.

▉▉▉▉ Appellants' third contention is that the trial court erred in denying appellants' motion to acquit because of alleged failure to identify the informer Thomas, or to produce him at the trial. In the instant case Thomas was not a participant in any of the offenses charged against the appellants. His identity was disclosed. All of the officers testified that the name of the informant was Jesse Thomas, and one professed a long acquaintance with him. Clearly, under the record, the existence of the informer was not a fiction, and he was personally known to at least one of the defendants. Appellants made no effort to subpoena Thomas as a witness. Appellants made no claim that the existence of Thomas was a fabrication to support a questionable arrest. The situation in this case is clearly distinguishable from the facts in Roviaro v. United States, 1957, 353 U.S.

53, 77 S.Ct. 623, 1 L.Ed.2d 639, in which case the informer was identified only as John Doe. The rationale of the Roviaro case is that the government should identify the informer in order to insure that a defendant can have a full and fair chance to defend himself against the offenses charged by having knowledge of who the informer is. The Court emphasized that this is especially a requirement of fairness when the informer has been an active participant in the crime charged. We believe that the government was faithful to the rationale of the Roviaro case in the disclosures that were made as to his identity by the officers engaged in the enterprise. The reliability of Thomas was not disputed. Furthermore, the information furnished by Thomas formed only a part of the "probable cause" upon which the officers acted at the time of making the arrests. The officers divulged information as to Thomas' existence and help in initiating the enterprise. They all testified that they did not know the whereabouts of the informer at the time of trial, nor had they seen him since he withdrew from the enterprise on February 13, 1958. See Jones v. United States, D.C.Cir., 1959, 271 F.2d 494.

Furthermore, the government was not obligated to present Thomas as a witness. This Court considered the same question in Eberhardt v. United States, 1958, 262 F.2d 421, and at page 422 stated, "But the failure of the Government to produce an informer or other person as a witness does not violate the defendant's rights. (Citations omitted.) The Government has no duty to place on the witness stand every person with some knowledge of the circumstances." The trial court properly denied appellants' motions to acquit.

Appellants' fourth contention is that the signed confession of Cook was inadmissible, and the trial court erred in receiving such confession into evidence. The trial court instructed the jury that such evidence was to be considered only in reference to Cook. Appellants' main argument under this contention is that the confession was the product of illegal detention, contrary to Rule 5(a) of the Federal Rules of Criminal Procedure. Rule 5(a) provides:

"An officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available commissioner or before any other nearby officer empowered to commit persons charged with offenses against the laws of the United States. When a person arrested without a warrant is brought before a commissioner or other officer, a complaint shall be filed forthwith."

Appellant Cook was arrested at 3:00 o'clock in the afternoon, February 24, 1958. He was kept on the premises until the search was completed, between 5:00 and 5:30 p. m. Both appellants were then taken to the narcotics agent's office, where they arrived about 6:00 p. m. He was kept there two or three hours, when he was booked at the county jail. It was while Cook was detained at the narcotics agent's office that the confession was made. Prior to the questioning Cook was informed of his right to a lawyer, that he was under no duty to answer questions, and that anything he might say would be used against him in the event of prosecution. Cook makes no contention that he was physically mistreated in any manner or that threats of any kind were made by the officers, but he does contend that the officers promised to help him in securing his car and protect him in his employment. The officers denied making any such promises.

Cook was arraigned before United States Commissioner Theodore Hocke in the morning of February 25, 1958. Hocke testified that his office was located in the Federal Building at Los Angeles, and that he was the only United States Commissioner in the County of Los Angeles, except during his absence when the Clerk of the United States District Court was authorized to act as commissioner. Mr.

Hocke's residence was some 30 to 45 minutes drive from his office. His office hours were from 9:00 o'clock in the morning until 4:30 or 5:00 o'clock of each day, and he was not required by the Judges of the United States District Court for the Southern District of California to keep his office open for the transaction of business on a 24-hour day basis. He further testified that it was not his practice to accept phone calls requesting arraignments out of office hours "except perhaps on weekends or holidays, or something of that kind, if the circumstances warrant it." One of the officers testified that Commissioner Hocke was not in his office when Cook was brought to the Federal Building at about 6:00 p. m. on February 24, 1958, and that no effort was then made to communicate with Mr. Hocke.

 The law is clear that Cook's confession was not rendered inadmissible by the single fact that it was made while in the custody of the officers. As stated in McNabb v. United States, 318 U.S. 332, at page 346, 63 S.Ct. 608, 615, 87 L.Ed. 819: "The mere fact that a confession was made while in the custody of the police does not render it inadmissible."

The crucial question raised on this phrase of the case is: Was Cook's detention following his lawful arrest illegal at the time of his confession as violative of the provisions of Rule 5(a)? If the answer is in the affirmative, Cook's confession should have been excluded if substance is to be given to the language of the Supreme Court of the United States appearing in Upshaw v. United States, 335 U.S. 410, in which the following statement appears at page 413, 69 S.Ct. 170, at page 172, 93 L.Ed. 100:

"The Mitchell case, 322 U.S. at page 68, 64 S.Ct. at page 898 [United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140], however reaffirms the McNabb rule that a confession is inadmissible if made during illegal detention due to failure promptly to carry a prisoner

before a committing magistrate, whether or not the 'confession is the result of torture, physical or psychological * * *'"

The same views were expressed by retired Justice Stanley Reed in Porter v. United States, 1958, 103 U.S.App.D.C. 385, 258 F.2d 685, certiorari denied 360 U.S. 906, 79 S.Ct. 1289, 3 L.Ed.2d 1257, wherein the following statement appears at page 688 of 258 F.2d:

"Illegal detention under the Federal Rules occurs when there is 'unnecessary delay' in the preliminary hearing preceding the statement. The statement is then inadmissible whether it is voluntary or unvoluntary in the common law or due process sense.[7]

"[7] Cf. McNabb v. United States, supra, 318 U.S. at page 339, 63 S.Ct. 614."

Cf. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479.

If the answer to the question posed above is in the negative the confession was properly received in evidence. United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140.

 The legality of the detention depends upon whether the delay between arrest and arraignment was or was not necessary. The law appears to be clear that the arresting officers do not have to make a bee line to the Commissioner's office. As stated in Mallory at page 453 of 354 U.S., at page 1359 of 77 S.Ct.:

"Provisions related to Rule 5(a) contemplate a procedure that allows arresting officers little more leeway than the interval between arrest and the ordinary administrative steps required to bring a suspect before the nearest available magistrate."

"On page 455 of the same opinion, page 1359 of 77 S.Ct., appears the following statement:

"The duty enjoined upon arresting officers to arraign 'without unnecessary delay' indicates that the command does not call for mechanical or automatic obedience. Cir-

cumstances may justify a brief delay between arrest and arraignment, as for instance, where the story volunteered by the accused is susceptible of quick verification through third parties. But the delay must not be of a nature to give opportunity for the extraction of a confession."

Reasonable delay incident to the "booking procedure" of one in custody appears to be permissible under Mallory v. United States, supra. The concept of "round the clock" arraignments in order to comply with Rule 5(a) was rejected in Porter v. United States, supra.

It appears to us that no hard and fast rule can be laid down as to what circumstances may or may not constitute "unnecessary delay". The circumstances will vary greatly from case to case, and from metropolitan area where there may be several available commissioners to other areas where there is but one commissioner serving on a part time basis. Whether or not a confession should be excluded or omitted as violative of Rule 5(a) is a question of law to be determined by the district judge. Often such question of law can be reached only after a resolution of the factual situation presented by the facts and circumstances in the particular case. In the instant case, if Cook had been taken to the commissioner's office immediately following his arrest, or even after the delay of "booking procedure", perhaps he could have been arraigned before Commissioner Hocke left his office on that day. Was the delay caused by keeping Cook at the searched premises until the search had been completed a necessary delay? Appellee contends that such delay was necessary because it is good law enforcement practice to keep an arrestee at the premises where arrested until the search has been completed. In our view the answer to the question posed presented a question to be resolved by the trial judge in arriving at his ultimate conclusion as to the reception or exclusion of the confession. Witnesses testified before the district judge in the absence of the jury on the phase of the case under discussion. In ruling that the confession was not excludable under the provisions of Section 5(a) the trial judge necessarily determined that there was no "unnecessary delay" from the time of the arrest to the time of the arrival at the Federal Building in downtown Los Angeles. We are in no position to hold as a matter of law that the trial court's ruling was error.

If the delay caused by keeping Cook at the searched premises was necessary, was the additional delay necessary because Cook's arrival at the Federal Building was after the business hours of the commissioner? Likewise in ruling that the confession was not excludable, the trial judge necessarily determined that there was no "unnecessary delay" caused by the fact that no round the clock commissioner was available. In view of the present state of the law, we are unable to say as a matter of law, that Rule 5(a) requires round the clock availability of a commissioner.

We hold that the trial court did not err in not suppressing the confession as having been obtained in violation of Rule 5(a).

It is to be borne in mind that in the foregoing discussion on this phase of the case we have been considering only a violation of Rule 5(a), and not the violation of any constitutional right. We should also point out that there were no aggravating circumstances such as appear in McNabb, Mallory and Upshaw.

It should also be noted that the trial court, after a hearing in the absence of the jury, permitted evidence to go to the jury as to whether or not the confession was voluntarily made. This subject was covered by complete and appropriate instructions to the jury, the last of which stated in part: "And in that respect the court would expect you to use your common sense, and if you feel that the confession, the statement signed by the defendant Cook, in any manner was obtained in an unfair manner, I would hope and expect you to disregard it, because we are not interested in anything but fair play."

Appellants' final contention is that the evidence was insufficient to sustain the conviction of appellants, and that the trial court erred in denying appellants' motion for acquittal, or for a new trial.

We have reviewed all of the testimony in this case and are unable to agree with appellants' contention. Evidence must be viewed in the light most favorable to support the judgment. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Robinson v. United States, 9 Cir., 1959, 262 F.2d 645.

The judgments appealed from must be and are affirmed.